UNDERWOOD et al. v. TEXAS & P. RY. CO. et al.    (No. 7357.)†

(Court of Civil Appeals of Texas. Dallas. May 8, 1915. Rehearing Denied July 3, 1915.)

1. CONTRACTS ☞186 — CONSIDERATION—PERSONS ENTITLED TO ATTACK CONSIDERATION.
    That a contract between a railway company and a labor union providing for the employment of a specific percentage of employés from members of such union, and preference to such members in employment, was unilateral, wanting in mutuality, and unenforceable at law, could not be complained of by strangers to the contract not in privity with the parties thereto.
    [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 790–797; Dec. Dig. ☞186.]

2. CONTRACTS ☞108 — VALIDITY — PUBLIC POLICY.
    Such contract was not void as against public policy, as, in the absence of any conspiracy

or combination against any individual or organization to prevent employment, the railway company was free to employ whom it pleased, especially in view of Pen. Code 1911, art. 1477, providing that it shall be lawful for persons engaged in any kind of work to associate themselves together and form trade unions and other organizations for the purpose of protecting themselves in their respective pursuits and employments, and article 1479, providing that nothing therein contained shall interfere with the terms and conditions of private contracts with regard to the time of service or other stipulations between employers and employés, and also in view of the fact that the membership of such union greatly exceeded the membership of any other union, and that a larger percentage of the members of a rival union complaining of the contract were employed than of the union in question.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 498–503, 505, 507–511; Dec. Dig. &#9672;108.]

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Suit by J. A. Underwood and others against the Texas & Pacific Railway Company and others. Judgment for defendants, and plaintiffs appeal. Affirmed.

J. C. Patton and H. P. Lawther, both of Dallas, for appellants. Flippin, Gresham & Freeman, Forest M. Anderson, C. C. Huff, and A. H. McKnight, all of Dallas, and Odell & Turner, Dee Estes, and T. J. Powell, all of Ft. Worth, for appellees.

RAINEY, C. J. This is a suit for a writ of injunction, brought by appellants against appellees to obtain relief from the continued enforcement and carrying out of a purported contract or agreement alleged to be in existence between the Brotherhood of Railway Trainmen and the defendant railroads, by the terms of which it is substantially provided that in the employment of switchmen in their yards no persons who were not members of the Brotherhood would be given employment by said railroads, and for a decree declaring said purported contract or agreement void. The grounds for such relief, as stated in the bill, are that the plaintiffs, being by occupation switchmen of many years' experience; being expert and proficient in said calling and fully competent to perform the duties of railroad switchmen; being ablebodied, industrious, and sober, with no habits disqualifying them from efficiently performing the duties of railroad switchmen; being heads of families dependent upon them for support; and being without means of earning a livelihood for themselves other than by work in their said trade—were refused employment as switchmen by the railroads, and were not permitted to continue in the employment of said railroads as switchmen, for the sole and only reason that they were not members of the Brotherhood of Railway Trainmen, in accordance with the provisions of said purported contract or agreement. Complainants charge that the defendant railroads claim that they are bound by the pro-

visions and terms of their said contracts with the Brotherhood of Railway Trainmen, under which they are unable to employ any persons in their yards, in the state of Texas, as switchmen, who are not members of the Brotherhood of Railway Trainmen, and under which, if they should ascertain that any persons in their employment in their yards as switchmen were not members of said Brotherhood they were compelled to discharge them, regardless of their expertness and proficiency and their ability and qualifications to perform satisfactorily their work; that a person seeking employment with said railroads as switchmen in their yards is required to make written application therefor, and to state in said application whether he be a member of the Brotherhood of Railway Trainmen, and, if it appears that he is not a member of said Brotherhood, that he will be refused employment by said defendant railroads, regardless of his fitness, experience, expert knowledge, and qualifications for such work. Complainants further charge that said purported contract between the Brotherhood of Railway Trainmen and the defendant railroads is illegal and void, as being without consideration, against public policy, discriminatory, preventive of competition and of the freedom of contract, creative of a monopoly of labor, destructive of the liberty and property of the complainants, and creative of a combination in the interest of monopoly to prevent the employment, as well as to compel the discharge of competent men who were willing to work, but who were not members of the Brotherhood of Railway Trainmen, that its continued enforcement by the railroads and the Brotherhood of Railway Trainmen will work irreparable injury to complainants, and that they have no adequate remedy at law.

Appellees, railway companies, in their answer, admitted that they had an agreement with the Brotherhood of Railway Trainmen to give preference to the employment of Railway Trainmen on the part of the Missouri, Kansas & Texas Railway Company to not less than 85 per cent., and on the part of the Texas & Pacific Railway Company to 75 per cent., and to make no change in men now employed, but to accomplish this in the hiring of men as vacancies occur. Said railway companies further answered, denying that there was any agreement or understanding between each other to make contracts of employment with the Brotherhood of Railway Trainmen, and deny that any contract exists to employ said Brotherhood to the exclusion of other experienced switchmen.

The Brotherhood of Railway Trainmen answered, and, among other things, denies specifically that it had any kind of contract with any one or either of the railway companies set out in appellant's bill that it would or would not employ any person as a switchman who was not a member of the

said Brotherhood of Railway Trainmen. It further denied the allegations of plaintiffs, and set out portions of the contracts made, being, in substance, the same as admitted by the Missouri, Kansas & Texas Railway Company and the Texas & Pacific Railway Company in their answers; and further answered:

"It shows to the court that its membership is composed of one hundred and thirty-five thousand or more men, and that the Switchmen's Union of which it verily believes and charges is the real plaintiff herein, and encouraging and instigating the bringing of this suit by the several plaintiffs who joined in the same, is an order composed, as it is informed and believes, of some nine or ten thousand members. It verily believes, and charges the fact to be, and so states, on information and belief, that it, the Brotherhood of Railway Trainmen, has an excess of membership in the ratio of more than ten to one over and above that of the aforesaid Switchmen's Union, and that, among those within this state who by occupation pursue the business of switchmen, nine-tenths or more are members of its (defendant's) order, and that its contracts with the several defendants herein, wherein it has sought to provide for a percentage employment basis of its members, is not only not discriminatory as to nonmembers of its order, but, on the other hand, is exceedingly fair and just, and, if there be discrimination in said percentage, it is against the defendant rather than those who are not its members."

The plaintiffs dismissed as to all railway company defendants, except the Missouri, Kansas & Texas Railway Company and the Texas & Pacific Railway Company, and the case was tried as to them and the Brotherhood of Railway Trainmen. Upon a hearing the trial court refused to issue the writ of injunction, and entered judgment for appellees, from which appellants prosecute this appeal.

From the evidence adduced on the trial we draw the following conclusions of fact: The following articles of the contract entered into between the Missouri, Kansas & Texas Railway Company and the Brotherhood of Railway Trainmen that pertain to the issues herein are:

Article No. 1 (b). "In the employment of yardmen, the companies will employ none but reliable and experienced men, when available."

Article No. 17. "Yard crews will not be required to work short handed, when experienced yardmen are available, and will not be required to work inexperienced men when experienced men are available."

Article No. 18 (a). "It is understood that the Brotherhood of Railroad Trainmen represented in this agreement will be insured not less than eighty-five per cent. of the yardmen employed in each yard, and will be given preference in the employment in each yard, and will be given preference in the employment of yardmen, when available."

(b) "The foregoing will not be retroactive, and will not displace men who are now properly assigned."

The contract made with the Texas & Pacific Railway Company was substantially that made with the Missouri, Kansas & Texas Railway Company, except the men to be employed was 75 per cent. instead of 85 per cent. After these contracts were entered into, the railway companies required all applicants to state whether or not they were members of the Brotherhood of Railway Trainmen. The appellants each made application for employment as switchmen to one of the said companies, but, not being members of Brotherhood of Railway Trainmen, were turned down, and the reason given was that they were not members of said Brotherhood, although at that time money matters were stringent, many men were out of employment, and the railroads had reduced their force and were working just as few men as practicable. The membership of the Brotherhood of Railroad Trainmen is about 135,000, and that of the Switchmen's Union about 10,000. In the Dallas yards the Switchmen's Union has 14 men, the Railroad Trainmen 9, and there were 12 other men in these yards—nonunion men and O. R. C. men. In the Ft. Worth yards the Brotherhood of Railway Trainmen, appellee, has 60 per cent.; the Switchmen's Union, the remaining men. In the Marshall yards, the Brotherhood of Railroad Trainmen have about 60 per cent.; the other yards a little less than 75 per cent. as applied to the Texas & Pacific Railway Company. That, within the last few months, a great number of men not only members of the Brotherhood of Railroad Trainmen, but other organizations, and nonunion men, were out of employment and applying for places but could not get the same. That in some of the yards negroes are employed as well as nonunion men, and union men other than appellants. In proportion to the membership of the appellee the Brotherhood of Railroad Trainmen, if there is any discrimination in the employment of men, it is against it. That members of the Switchmen's Union have been employed in the Dallas yards since the agreement was made between the Brotherhood of Railroad Trainmen and the Texas & Pacific Railway Company and the Missouri, Kansas & Texas Railway Company. This is also true of other yards. That while the appellee, the Brotherhood of Railroad Trainmen has not got the percentage of men as per their agreement with the other appellees, still nothing has been done by it, or any of its members, to coerce or try and force them to give more Brotherhood of Railway Trainmen men employment even though a big percentage of its membership is out of employment and have been refused places just as Switchmen's Union men have.

[1, 2] The appellants present, first, that "the contract is unilateral in character, wanting in mutuality, and unenforceable at law." They are met by appellees with the counter proposition that they are strangers to the contract, and there is nothing in the pleadings nor by the evidence in the record to show that there is any privity of contract between the parties. The appellants not being privies to the contract between the railway companies and the Brotherhood of Railway Trainmen, they are in no position to

complain. But they say "the contract is void, as against public policy, as preventive of competition, and creative of a monopoly of labor." We de not agree with this proposition. There is nothing to show that there was any conspiracy and combination between the appellees which contravenes any law of this state or of the United States. There is nothing in the contract which interferes with the interest of society nor interferes unlawfully with the liberty of appellants to pursue their chosen avocations consistent with the rights of others. The law gives to the railroad companies the right of contract and the same right to all other legal organizations so long as such contracts they make are not violative of law. Our statutes authorize laborers to associate themselves together, form trade unions, etc., for their protection, in their respective callings. Pen. Code, art. 1477. Article 1479 provides that the Anti-Trust Law shall not interfere with the terms and conditions of contracts relating to private contracts as to service of employment between employer and employé. The contract between the railway companies and the Brotherhood of Railway Trainmen was legal, it being for the benefit of the individual members of that order in securing·work, and for the railways in securing skilled and efficient workmen to protect their interest.

The evidence does not show that they would have been employed by the railroads had there been no contract with the Brotherhood of Railroad Trainmen. Appellants merely show that the railways gave as an excuse for not giving them employment that they were not members of the Brotherhood of Railway Trainmen. This the railways had the right to do. They were free to employ whom they pleased, and this right cannot be questioned, not being connected with any conspiracy or combination against any individual or organization to prevent employment.

In Delz v. Winfree, 80 Tex. 400, 16 S. W. 111, 26 Am. St. Rep. 755, it was said by Mr. Justice Henry, speaking for our Supreme Court:

" 'A person has an absolute right to refuse to have business relations with any person whomsoever, whether the refusal is based upon reason or is the result of whim, caprice, prejudice, or malice, and there is no law which forces a man to part with his title to his property.' The privilege here asserted must be limited, however, to the individual action of the party who asserts the right. It is not equally true that one person may from such motives influence another person to do the same thing. If without such motive the cause of one person's interference with the property or privileges of another is to serve some legitimate right or interest of his own, he may do acts himself, or cause other persons to do them, that injuriously affect a third party, so long as no definite legal right of such third party is violated."

This principle applies here, as the railways were acting within their legal rights in refusing appellants employment.

Appellees present the proposition that "workmen have the absolute right to combine and make agreements with reference to fixing wages at which they will give their labor, either individually or collectively, to employer, provided the same is free from any conditions that tend to obstruct or molest others from lawfully working elsewhere." Jacobs v. Cohen, 183 N. Y. 207, 76 N. E. 5, 2 L. R. A. (N. S.) 292, 111 Am. St. Rep. 730, 5 Ann. Cas. 280.

The decisions of this state and the United States, we think, make clear the distinction between the two classes of contracts in regard to labor, where such are legal and those affected by conspiracy, etc.

In the case of Jacobs v. Cohen, supra, this principle is very thoroughly discussed, and a distinction is clearly drawn between the two classes of contracts, and between the acts which would be lawful and unlawful. This case discusses the difference between the case of Curren v. Galen, 152 N. Y. 33, 46 N. E. 297, 37 L. R. A. 802, 57 Am. St. Rep. 496, and that class of cases which come within the terms of the contracts existing between the appellees in the case now before the court. Justice Gray in the case of Jacobs v. Cohen, supra, says:

"In the general discussion of the question (in Curren v. Galen), I conceded the general right of workingmen to organize for the common good of the members, and sought to show how the agreement and acts there in question were contrary to public policy and unlawful, because oppressive and restricting the freedom of others to engage in the same line of occupation, or to make a livelihood at their trade, as a penalty for refusing to join the defendants' organization. That was a very different case from the present one. The subsequent case of National Protective Association v. Cumming, supra, in no wise overruled Curren v. Galen. It was not at all within the principle of the prior case. It concerned a dispute between rival labor organizations. The plaintiff organization sought to restrain the defendants from preventing the employment of its members and from procuring their discharge by any employer through threats and strikes, and the reversal of a judgment awarding the relief demanded was affirmed by this court. The right of the defendants, in that case, to refuse to permit their members to work with others, who were members of a rival organization, and to bring about their discharge upon the common work in which they were engaged, if confined to threats to withdraw from the work, or to ordering a strike of their own members, without resort to injurious acts, was admitted. The defendants' effort was not to compel the others to join with their organization as a condition of being allowed to work, and, whether it was to secure only the employment of approved workmen (which was a possible inference from the facts), or whether it was to obtain an exclusive preference in employment, if without resort to force, or the commission of any other unlawful acts, it was not within the condemnation of the law."

Justice Gray further says, in the Jacobs v. Cohen Case, that every man has the right—

"to carry on his business in any lawful way that he sees fit. He may employ such men as he pleases, and is not obliged to employ those whom, for any reason, he does not wish to have work for him. He has a right to the utmost freedom of contract and choice in this regard."

In the case of State v. Mitchell Furniture Company, 26 Mont. 22, 66 Pac. 496, 55 L. R. A. 644, 91 Am. St. Rep. 386, the court says—"that a contract between private persons may provide that it shall cease to be obligatory or to be void if either party to it shall employ non-union men, and the law will permit the provision to have its full force; and so with the inhibition against the hiring of union men, and with all other stipulations which are not impossible of performance, not immoral, nor contrary to public policy."

A contract by an employer to employ, as laborer, none but members of a particular class or union is not void as against public policy. The railway companies by entering into the contracts herein, did not create a monopoly which interfered with or prevented others, unlawfully, from exercising the freedom of contract in relation to the sale of labor. There is reason in contracting with the Brotherhood of Railway Trainmen, for its membership greatly exceeded the membership of any other particular union, which was a guaranty of keeping a full working force. But the contract is not exclusive, and provides for only a certain per cent. of Brotherhood of Railway Trainmen, and the evidence shows appellees have a larger per cent. of other classes employed than of the Brotherhood of Railway Trainmen in proportion to membership.

In People v. Marcus, 185 N. Y. 257, 77 N. E. 1073, 7 L. R. A. (N. S.) 282, 113 Am. St. Rep. 902, 7 Ann. Cas. 118, it is said:

"Contracts for labor may be freely made with individuals or a combination of individuals, and, so long as they do not interfere with public safety, health, or morals, they are not illegal. The views of this court as to what constitutes freedom to contract in relation to the purchase and sale of labor, and as to what contracts relating thereto are lawful and enforceable, were stated with much detail and ability by the members of the court when the cases of National Protective Association v. Cumming, 170 N. Y. 345, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648, and Jacobs v. Cohen, 183 N. Y. 207, 76 N. E. 5 [2 L. R. A. (N. S.) 292, 111 Am. St. Rep. 730, 5 Ann. Cas. 280], were decided, and the decisions in those cases are substantially controlling in the determination of this appeal. In National Protective Association v. Cumming, supra, it was said that a person may refuse to work for another on any ground that he may regard as sufficient, and the employer has no right to demand a reason for it; but, even if the reason is that the employé refuses to work with another who is not a member of his organization, it does not affect his right to stop work or to refuse to enter upon an employment. The converse of this statement must be true, and an employer of labor may refuse to employ a person who is a member of any labor organization or he may make an employment conditional upon the person employed refraining from joining or becoming a member of a labor organization. It is a well-known fact that combinations of employés and also of employers require their members to do or refrain from doing many things which they deem to their individual and combined advantage while a person not a member of such an organization can act in accordance with the terms of such agreement as he may choose to make. A person employing labor may decide that it is to his advantage to employ only union labor, and be willing to enter into an agreement necessary to procure such labor or he may decide that it is to his advantage * * * to make the employment conditional upon an agreement that such employé will not join or become a member of a labor organization."

Where Congress and several of the states have enacted laws attempting to limit the power of corporations and individuals in regard to making contracts for labor as they see fit such laws have been held unconstitutional by the appellate courts. Coppage v. Kansas, 236 U. S. 1, 35 Sup. Ct. 240, 59 L. Ed. 441; Jacobs v. Cohen, 183 N. Y. 207, 76 N. E. 5, 2 L. R. A. (N. S.) 292, 111 Am. St. Rep. 730, 5 Ann. Cas. 280; Brick & Tile Co. v. Perry, 69 Kan. 297, 76 Pac. 848; Railway Co. v. Brown, 80 Kan. 312, 102 Pac. 459, 23 L. R. A. (N. S.) 247, 127 Am. St. Rep. 213, 18 Ann. Cas. 346. For instance, where the Legislature of Kansas passed an act declaring that it would be—

"unlawful for any individual, firm or corporation to coerce, require, demand or influence any person or persons to enter into any agreement, either written or verbal, not to join or become or remain a member of any labor organization or association as the condition of such person or persons securing employment or continuing in the employment of such individual, firm or corporation, or in any wise limiting the power of employers and employés to contract as they see fit."

Under this act Coppage was convicted, and on appeal to the Supreme Court of the United States that court held said law to be unconstitutional, and reversed and remanded the case. Coppage v. Kansas, supra. In discussing that case it was said:

"And since a state may not strike them down directly, it is clear that it may not do so indirectly, as by declaring, in effect, that the public good requires the removal of those inequalities that are but the normal and inevitable result of their exercise, and then invoking the police power in order to remove the inequalities, without other object in view. The police power is broad, and not easily defined, but it cannot be given the wide scope that is here asserted for it, without in effect nullifying the constitutional guaranty. * * * It is said in the opinion of the state court that membership in a labor organization does not necessarily affect a man's duty to his employer; that the employer has no right, by virtue of the relation, 'to dominate the life nor to interfere with the liberty of the employé in matters that do not lessen or deteriorate the service'; and that 'the statute implies that labor unions are lawful and not inimical to the rights of employers.' The same view is presented in the brief of counsel for the state, where it is said that membership in a labor organization is the 'personal and private affair' of the employé. To this line of argument it is sufficient to say that it cannot be judicially declared that membership in such an organization has no relation to a member's duty to his employer; and therefore, if freedom of contract is to be preserved, the employer must be left at liberty to decide for himself whether such membership by his employé is consistent with the satisfactory performance of the duties of the employment. * * * The business conducted by the defendant was its property, and in the exercise of his ownership it is protected by the Constitution. It could abandon or discontinue its operation at pleasure. It had the right, beyond the possibility of legislative interference, to make any contract with reference thereto not in violation of law. In the operation of its property it may employ such persons

as are desirable, and discharge, without reason, those who are undesirable. It is at liberty to contract for the services of persons in any manner that is satisfactory to both. No legislative restrictions can be imposed upon the lawful exercise of these rights."

The contract here is not against public policy, as it in no way affects the real needs of the people in their health, safety, comfort, or convenience. Railway Co. v. Griffin (Sup.) 171 S. W. 703.

The judgment is affirmed.